FILED COPY

2013 JUN 12  PM 2: 49

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY _____

Karen E. Ford
SW Ocean Ave & Mission, Suite 208
PO Box 287
Carmel-by-the-Sea, California 93921-0287
Phone: 831-250-6433
Fax: 831-250-6844
karen@fordslaw.com
SBN 88358
Attorney for Plaintiff Herbert I. Hanson

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

HERBERT I. HANSON
    Plaintiff

v

RAYTHEON COMPANY
    Defendant

CASE NO.: **SACV13-00896 DOC (JPRx)**

## COMPLAINT

Plaintiff complains and for causes of action alleges as follows:

### PARTIES

1.  Plaintiff Herbert I. Hanson (HANSON) is a resident of California and a former employee of defendant Raytheon Company at its Space and Airborne Systems division in El Segundo, California. Plaintiff is black and a native of Africa.  His national origin is Nigerian.

2.  Defendant Raytheon Company (RAYTHEON) is a corporation incorporated in Delaware with a principle place of business located at 2000 E. El Segundo Boulevard, El Segundo, CA 90245-0902.

### JURISDICTION AND VENUE

3.  This is an action brought under Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq. (Title VII) and the enforcement provision 42 USC 2000e-5(f). Jurisdiction for such claims is set forth in 42 USC § 2000e-5(f)(3) and 28 U.S.C. C 1331. This action is also brought for race discrimination pursuant to 42 USC § 1981 and for retaliation pursuant to the False Claims Act 31 U.S.C. § 3729 et. seq. and 31 U.S.C. § 3730. Jurisdiction for such claims is set out in 31 USCS § 3732 and in 28 U.S.C.1331. This action also includes

1   state law claims pursuant to the California Fair Employment and Housing Act and California state common

2   law. This court has pendent jurisdiction over said claims pursuant to 28 U.S.C. § 1367.

3                                      **DEMAND FOR JURY TRIAL**

4        4.   Plaintiff Hanson demands a jury trial as to all issues permitted by law.

5                      **BACKGROUND FACTS COMMON TO ALL CAUSES OF ACTION**

6        5.   Plaintiff HANSON was formerly employed by RAYTHEON as an engineer. On June 30th, 2008, he

7   was hired into Raytheon's Space and Airborne Systems (SAS) as Manager III, Engineering, to manage and

8   lead a team of 13 Engineers. He reported to Esther Wilson, Senior Manager (Dept. Manager). Prior to

9   joining Raytheon, HANSON'S career was on an incline. HANSON'S three month appraisal at RAYTHEON

10  showed no problems, and, in fact, was complimentary. During his first year at Raytheon, HANSON was one

11  of the individuals chosen to conduct interviews for new hires. All of his recommendations for new hires

12  were implemented, and the individuals were hired. The 2008 performance appraisal reflected no major

13  issues or concerns and was complimentary. HANSON'S salary was increased as a result of the excellent

14  2008 performance evaluation.

15       6.   On or about November 2008, Esther Wilson was replaced by Christopher (Chris) Fudge, and

16  the Engineering Center's (EC) Deputy Director, Rahul Dixit, was replaced by Noel Ellis.

17       7.   In the fall of 2008 HANSON was directed by a Program Manager to address a customer concern. The

18  directive had come from a Vice President who directed that he be copied on all correspondence. In his response to the

19  request, HANSON copied the VP as directed. Ellis became extremely angry with HANSON for copying the VP.

20       8.   In or about December 2008, HANSON began noticing hostility from Ellis. In February of 2009,

21  Fudge cautioned HANSON to stay in the background and not make his presence felt. Fudge refused to

22  state a reason. About the same time, in a manager's meeting,  Ellis sarcastically called HANSON "Mr.

23  Overachiever".

24       9.   In March 2009, Fudge told HANSON "I think you should look for other options". He did not provide details,

25  but stated that he was eliminating HANSON'S section and integrating his staff members into other sections. HANSON

26  was left in limbo. Two months later, Ellis put out a requisition for Manager III, Engineering, the position HANSON had

27  held before the elimination of his section. HANSON indicated he was interested in the position and would re-apply.

28  Thereafter, Ellis changed the requirement for the position from the normal position requirement to a candidate with

CEO and company owner experience, thus disqualifying HANSON from the position he had held two months prior.

10.  HANSON applied and interviewed for the position of Program Manager within the MP-RTIP. He informed Fudge of the interview and the fact the Program Director who interviewed HANSON, might be calling Fudge concerning the possible transfer of HANSON to the Program Manager position.  Within days of this communication, HANSON was informed that the available position had been changed to Program Director. HANSON was told that he did not make the list of candidates because the Program Manger position he had applied for had been cancelled. Within the next 2 to 3 months, HANSON applied for about a dozen positions in different centers and programs within RAYTHEON.  He interviewed for two of the positions. In both instances the managers conducting the interviews indicated interest in initiating the transfer but he was not chosen.  To HANSON'S surprise, as of July 2009, he was moved into a newly created department.

11.  HANSON'S 2009 midyear review was conducted by Fudge. In that review Fudge wrote that HANSON had charged multiple hours onto the overhead charge number. Charging to an overhead charge number is not a violation of company policy. The overhead charge number is used when work is not associated to a specific contract. When time is attributed to the overhead charge number the government is not billed for the work. When time is attributed to a specific contract number then the time is billed to the government. The contention concerning use of the overhead charge number was not true. HANSON ordered a copy of his timecard from finance and forwarded it Fudge requesting that he revise the criticism about the overhead time charge. Despite the evidence Fudge refused to change the evaluation comments. Also, in the 2009 mid-year review, Fudge stated that HANSON had taken off too much time to take his son to the doctor. That statement was also not true. HANSON had not taken his son to the doctor since January of 2009 and explained this to Fudge. Again, Fudge refused to revise the statement in the review. As a result, HANSON'S 2009 mid-year review was left with demonstrably false accusations and statements.

12.  The midyear review is an informal performance review pursuant to company policy. The 2009 mid-year review which was completed and signed by Christopher Fudge and Ryen Wilson on 08/14/2009 at 7:12:22 PM Central Time. It made no mention or recommendation to place HANSON on Performance Improve Plan. (PIP).

13.  In about July 2009 another SAS-wide reorganization occurred. HANSON was assigned to another newly created department called the Test Group. He no longer acted in a manager role but he held the title of Manager, and was placed as Technical Staff under Ryen Wilson. Almost immediately, Wilson told HANSON that he was going to "change the perception" of HANSON by many people in the company. He said he had talked to a lot of people about HANSON, and there was a "perception" he did not like about HANSON. Wilson said he was going to "change that perception".

14.  Wilson said he based his statements about perception entirely on talking to people, many of whom HANSON had not worked with. He repeatedly said that Chris Fudge had provided information concerning HANSON. Accordingly, HANSON alleges that the basis for the "perception" described above originated with Fudge and Ellis.

15.  In almost every proposal or bid that HANSON worked on, Wilson made errors or poor decisions. He consistently insisted that HANSON take the blame for these. He repeatedly told HANSON that if he ever told the program office or his boss, Ken Johnson, about what was going on, Wilson would make sure HANSON would not succeed at Raytheon.

16.  On or about December 16th 2009, HANSON was scheduled to go on planned paid time off.  He had also fallen sick. Two days prior to the scheduled PTO, Wilson sent HANSON a one headline e-mail stating "Herb engage, see Jeff Giacone. He needs help on NuVision proposal bid." The proposal was due in less than week, and HANSON (in addition to having fallen ill) was leaving on vacation in two days. HANSON was aware of the NuVision proposal which Giacone had been working on since September 2009, and had expressed concerns to Wilson about Mr. Giacone's ability to perform that task. HANSON had tried to assist Giacone in preparing the proposal. Now, on the eve of HANSON'S planned time off, Wilson insisted that HANSON take over and complete the proposal before he left. Wilson told him that if he did not accomplish this task his "career will suffer". Giacone had told HANSON that in preparing the proposal he had "assumed" certain numbers and then took average of the assumed numbers. HANSON told Giacone it would be difficult to pass audit with the numbers he had developed.  In HANSON'S view the numbers could not be justified. The proposal should have been based on actual historical data in other similar tasks. Wilson insisted that HANSON find a way to justify the "bogus" numbers that Mr. Giacone had simply made up, or "pulled from the air" for the bid proposal. HANSON told Mr. Wilson that the numbers could not be

justified in the event of an audit. There was a heated conversation in Mr. Wilson's office which included insults, name-calling, and abusive language from Wilson towards HANSON. At the conclusion Wilson told HANSON to "get the fuck out of my office". "You Africans think you know everything". "Get the fuck off the program and get the fuck out of my office." Nobody can understand you." "Nobody can understand what the fuck you are saying" "You need to speak English." "Nobody likes you", "Get the fuck out of my face". The heated conversation came about after HANSON advised Mr. Wilson that he could not justify the made-up bid numbers and that RAYTHEON shouldn't try to justify the numbers. HANSON cautioned that if they tried to justify the numbers RAYTHEON would end up with a "black eye". HANSON insisted on following the set bid procedure which would pass audit. Wilson's response was "I don't care…., I don't care. You ain't going to tell me what to do" or words to that effect.

17.  HANSON later received an e-mail from Wilson asking HANSON to send him all the documents for the proposal. It was approximately 8:30 PM by this time. HANSON responded to the e mail telling Wilson he would get the proposal done in a way which would pass audit. HANSON continued to try to find ways to ascertain the basis for Jeff Giacone's numbers, but could not find a reasonable justification to use these numbers. The more HANSON looked at the numbers prepared by Giacone for the bid, the more concerned he became that the numbers would not pass audit. HANSON made the decision to use the normal process of historical data which was certain to pass audit. He worked the proposal and completed it at 3:30 AM.

18.  The next morning at about 10:00AM, HANSON'S cell phone rang. The caller was Wilson who picked up right where he left off the evening before, with the abusive and vulgar language and insults. He yelled, raved and ranted for some 20 minutes, saying that HANSON had refused to follow his orders to justify the made-up numbers. He continued on and said "This is a piece of crap". "I don't understand anything in here". "This is a piece of shit" HANSON asked him if he had read the proposal. He replied "No". HANSON repeatedly asked Wilson to calm down and assured him that the proposal he had completed would pass audit. Finally, after the verbal abuse, name-calling and use of vulgar language ("fucking" and "mother-fucker", and "fucking-shit") Wilson said when he was taking HANSON to Human Resources. He said HANSON should go straight to HR when he returned from the holiday shutdown.

19.  HANSON was not scheduled to return to work until January 4th, 2010. He asked Wilson to let him know if he would still be an employee of RAYTHEON. Wilson said "just go to HR, and you will be informed

1   of your position". In the midst of the yelling, HANSON had asked Wilson if he was on the speaker

2   telephone. Wilson said "Nobody can hear me". HANSON believes he was on speaker phone, as this was

3   his usual habit.

4        20. At the beginning of 2010, HANSON returned to work after the holiday shut down. He immediately

5   learned that Wilson had filed a complaint against him with HR before he left for vacation. Upon his return,

6   HANSON was summoned into Wilson's office to address the complaint. HANSON was clearly told by both

7   the HR Manager (Donna Boroughs) and Wilson that at RAYTHEON, you do not report or complain about

8   your line manager to his boss or higher. HANSON had been told by other employees that reporting your

9   line manager at RAYTHEON was a career suicide. At least one individual advised HANSON not to do this.

10  The employee cited other employees who were trapped, and whose careers had been seriously damaged

11  because they complained about their bosses. Even after being advised of this in the meeting, the HR

12  Manager asked HANSON to explain what happened. HANSON was very hesitant, for fear of what would

13  happen to his career. Mr. Wilson and the HR Manager insisted that HANSON tell his side of the story.

14  Finally, he began by stating that he felt any conduct on his part did not warrant Mr. Wilson going to HR to

15  complain. HANSON stated that Wilson, as a Senior Manager should have addressed and resolved any

16  issue at a lower level. At this point Wilson began yelling, "You ain't gonna to tell me what to do". "I am a

17  senior manager, I'm not going to sit here and listen to this shit". "I've been here for 27 years, you ain't

18  gonna come here and tell me what to do". As HANSON sat there quietly and listened to this bombardment

19  he repeatedly looked at Donna Burroughs. He was hoping for her to intervene, stop the yelling and insults,

20  and control the meeting to a professional and respectful discussion. She did not but eventually Burroughs

21  asked HANSON to speak and tell his side. He tried to do so. Wilson repeatedly and loudly interrupted

22  HANSON. He repeatedly told HANSON "You can't say that". Finally, having no recourse and being unable

23  to speak, HANSON stopped trying to explain what had been happening. Burroughs stated that she wanted

24  to meet again so she could hear from HANSON.

25       21. The next day, feeling that he would probably not be able to speak as long as Mr. Wilson was

26  present, HANSON drafted and a letter to Ms. Burroughs explaining what had happened. There was no

27  response to this letter.

28

22. On his returned from the holiday shutdown HANSON also found an e-mail from Roosevelt Womble in his inbox. Womble was angry that Wilson had promised the complete a proposal on a B2 program, but failed to provide it. Before he left on vacation HANSON had asked Wilson if there was anything that needed taken care of so he could  work on it during the holiday.  Wilson said there was nothing. On receiving the e-mail from Womble, HANSON contacted Wilson, who was on vacation. He told HANSON all Womble needed was a "rough estimate" and that HANSON should take two hours to prepare a rough estimate. However, the task ended up being a full blown proposal that took several days. HANSON had to put a cross-functional proposal team together. After several negotiations between the Program office and the cross functional teams on workable numbers, agreement was reached on proposal numbers that could get the deal accomplished. The next day, HANSON held a meeting to finalize the numbers. Wilson called into the meeting by telephone. He took control of the meeting and unilaterally derailed the agreement in spite of HANSON'S plea for him not to interfere with the agreement which had been reached between the Program Office and Software Department. Wilson told the software group not to accept the agreement because the number was too low for them. This was unusual. A Senior Manager in the meeting repeatedly asked Mr. Wilson to "let Herbert speak". Wilson said "No, I ain't gonna sit here and listen to this crap. This is a bunch of crap". That afternoon, the Program Office terminated the bid, and the Company lost the bid HANSON had worked so hard for. Mr. Wilson then sent out an email putting the blame for the loss of the bid squarely on HANSON.  Wilson told HANSON take the blame for it and not tell anyone he had derailed the proposal. HANSON reminded him that he had cautioned about interfering with the agreement. Wilson said HANSON'S career would suffer if he didn't take the blame on the bid cancellation.

23. HANSON made a request to HR to be transferred to another center or department but this went without an answer. HANSON personally told Wilson that he wanted to transfer out of the department. Wilson responded by yelling, "Where are you going to transfer to". "You are not going to transfer to anywhere until we get this shit figured out". Wilson was referring to getting the new department on a good footing.

24. On another program, the SSP Program, Wilson again interfered with a proposal by HANSON and derailed the proposal bid on the program. In this instance also Wilson again ordered HANSON to take the

blame for it. Four months later HANSON approached the program office (Chief Engineer) to request that he be allowed to resurrect the bid. He was permitted to do so, and the bid was completed, and awarded.

25. On or about February 2010, Wilson placed HANSON on a Performance Improvement Plan (PIP). He based his reason on HANSON'S 2009 performance.  The 2009 performance review had been concluded months earlier and reflected no need for a PIP. To support his position Wilson solicited input from 12 Peer Reviewers. Normally, only 2 to 6 peer review feedbacks are used according to company policy. HANSON had provided 3 peer reviewers as was requested. The reviewers he named were people HANSON had worked with. Wilson completely ignored and disregarded HANSON'S suggested peer reviewers and used the negative inputs from others to justify criticism of HANSON'S performance. HANSON had not worked with most of the individuals who provided negative input concerning his performance. HANSON did not receive a salary increase or bonuses for 2009 year, which everyone at RAYTHEON received.

26. Wilson outlined and assigned tasks which he directed HANSON must complete to remove the PIP status. Wilson and HANSON met every week to review the status and progress of PIP tasks. In every weekly meeting, they would spend 5 to 10 minutes discussing the tasks. Wilson would sign-off on each task as completed and meeting the requirements. HANSON would concur with his signature. Wilson spent most of the time in the meetings lecturing HANSON about how much influence Wilson had at RAYTHEON, and how, if he wanted, he could help HANSON "change people's  perception" of him and make HANSON'S life easy at Raytheon.

27. On or about March 15, 2010, immediately after the task review and sign-offs, Mr. Wilson said to HANSON, "Your career is fucked up, ain't it? Your career is fucked up… see I told you, you career was gonna be fucked up." "I talked to a lot of people and none of them like you". "We have to change the perception, if you want to succeed here". "I don't know what the perception is…., I'm just going by what people tell me". Wilson embarked on another course of retaliatory conduct towards HANSON and went around the facility telling others not to talk to HANSON and not to work with him. He also informed many people to watch HANSON because he had placed him on PIP. He repeatedly stated that he could "make [HANSON] fail or succeed at Raytheon because I have been here for 27 years" and "know how to play the politics".

28. Over the next three months, HANSON and Wilson completed all the assigned PIP tasks and signed off on each completed task. At the last meeting, Mr. Wilson told HANSON he was going to write up a summary of the PIP completion, which would remove the PIP status, and have HR sign off on it. Wilson showed HANSON a draft copy which began with the statement "Herb has shown improvement….". This report was created and logged on HANSON'S personal file. As provided in company protocol and policy, and Mr. Wilson promised they were to meet with HR and sign off on the final PIP summary. However, this meeting never took place. No one ever discussed this with HANSON.

29. Between March and May of 2010, HANSON led and successfully completed four more proposals without a problem. During this time Wilson was too busy to interface but he was kept apprised of the work.

30. On or about May 2010 another proposal bid was underway for the B2 ESMS. HANSON had fallen ill from the stress illness with stress -related rash on his hands, legs, head and chest. He went to Goleta, California, and brought back some proposal work to his home. Unable to go to the office, since his face had become covered and blackened with the sudden rash and skin infection resulting from stress, he worked from home. And over the next seven days he worked 11 to 12 hours per day from home, putting together and leading a cross-functional team for the proposal. Wilson insisted that HANSON also work with and train other Section Managers and 2 junior engineers. He also directed another Section Manager to "take the lead with [HANSON]. HANSON informed Mr. Wilson that he only had four days to complete the B2 proposal, but he insisted that HANSON train the other employees. HANSON explained to Wilson that the proposal would be cancelled if they were late in completing the effort. The proposal bid involved technical design of a cost reduction platform with up-to-date technology.

31. Unable to change his mind, HANSON did just what Wilson asked him to do. HANSON was on his private cell phone for 6 to 8 hours per day. HANSON had, on several occasions, requested a company cell phone which, as a Manager, he was entitled to have. Other mangers and even HANSON'S direct reports had company cell phones. Wilson and Fudge refused to approve a cell phone for HANSON and he had to use his private cell phone to conduct company business, often exceeding his allowable minutes by as much as 2000 minutes per month. As the proposal effort progressed with the training, HANSON repeatedly told Wilson that he was under the gun from the Program Office to complete the proposal and RAYTHEON

1   was in jeopardy of losing the bid if it was not done. In response Wilson, yelled "I DON'T CARE!", "DEMAND

2   TIME FROM THE PROPOSAL OFFICE".

3       32.   On or about 5/18/2010, HANSON called a meeting in Mr. Wilson's office to go over the proposal

4   effort. As HANSON arrived at his office, Mr. Wilson directed the junior engineer to go to the board and

5   explain the proposal work. Fearing that he had no time left and needed to complete the effort by close of

6   business that day per Program Office request, HANSON asked Mr. Wilson to allow him to take over and

7   explain it quicker and more effectively. He answered and said "No, sit over there". So for two hours they

8   struggled with the design but were unable to figure it out. Finally, Wilson asked HANSON to take over. As

9   he began to explain the design concept and the next step that needed to be done, Wilson began yelling at

10  HANSON. He shouted "You mean to tell me you sat here for two hour and watch us go on the wrong path,

11  and you didn't say anything?" HANSON pointed out that he was trying to redirect them, but Wilson kept

12  telling him to be quiet. He continued yelling and ranting. Finally he said, "I HAVE HAD ENOUGH OF YOUR

13  SHIT... I AIN'T TAKING THIS SHIT NO MORE... GET THE FUCK OUT OF MY OFFICE... AND GET THE

14  FUCK OFF THE PROGRAM... I'M TAKING YOU OFF THE PROGRAM".... GET THE FUCK OUT OF MY

15  OFFICE". HANSON asked him if he was sure that was what he wanted to do. Wilson walked up to

16  HANSON and leaned into his face and repeated "GET THE FUCK OUT OF MY OFFICE", and "get ready to

17  meet up with HR".

18      33.   Humiliated and shocked in front of everyone in the meeting, HANSON left. He felt humiliated and

19  demeaned. As HANSON arrived back to the south campus, he saw Ken Johnson, the Engineering Center

20  Director in the parking lot heading to his office. HANSON asked him if he could come see him. He said,

21  "sure". HANSON met with him in his office and explained to him what had just happened, and what he had

22  been going through the past six months. Johnson walked him over to the next office which was the office of

23  Noel Ellis, the Deputy Director. Ellis called in Donna Burroughs, the HR Manager. Again, HANSON

24  explained, with tears in his eyes, what had happened and what he had been going through with Wilson.  He

25  requested to be transferred. He further told them the statements Wilson had made, regarding "Your career

26  is fucked up...", and the insensitive and ethnic origin remarks, as well as the "I don't care" remark.

27      34.   Ellis downplayed the comments and said, "Herb, I don't think Ryen means any of that...., but he

28  cannot say 'I don't care', I will speak to him about that." Ellis asked Boroughs to set up a meeting with Ryen

Wilson, HANSON, and herself to discuss the matter. HANSON was asked to return to his office and wait until they could get Wilson for the meeting. Thirty minutes later, Boroughs called HANSON in his office, and happen to catch him in an emotional moment. The stress had become too much to handle. She asked HANSON, if he could talk, to come to her office so they could talk. The meeting with Wilson never took place. No one ever reported back to HANSON as to the result of his complaints.

35.   In July 2010, Mr. Wilson announced that HANSON had been transferred to Cef Vinas' section, as a Section Manager, reporting to Vinas. This was a demotion and certainly was not the transfer HANSON was hoping for. In his first meeting with Mr. Vinas, the first thing he said to HANSON was "Herb, you think you know everything… well, you don't know everything". "I'm just caught in the middle of this… I know Ryen did you wrong, and now he dumped this mess on my lap and copped out". Mr. Vinas told HANSON that Wilson had instructed him to do the PIP again. At that point, HANSON advised Vinas that he had already completed the PIP and was waiting for the final sign off from HR. Vinas responded and said, "I'm only doing what I was told to do by my boss". HANSON felt it was unfair, discriminatory due to his race and national origin, and that he was being punished in retaliation for his complaints. Vinas set up new tasks and goals for him to complete. Mr. Vinas didn't show much interest in HANSON or the PIP, let alone having HANSON report to him. However, for the next 4 months, HANSON met with him to sign off the completed tasks on the PIP.

36.   In or about November 2010, another SAS re-organization was underway. Wilson was transferred to another Center (SVC).  HANSON hoped to be transferred out of the Electronics Center, but was repeated told that he could not transfer because he was on PIP. HANSON alleges this was a strategy used to prevent him from transferring. Other employees had been allowed to transfer to other organizations while on PIP in order to allow them a fresh start. Although, Mr. Wilson had no direct authority over HANSON, he continued to harass HANSON. He instructed other program leads to closely monitor him and report his activities directly to Wilson.

37.   In December 2010, HANSON had taken on a task to write a critical large software code for the NuVision program. There was no experienced person to do the task. As an experienced programmer in that platform, HANSON stepped in and wrote the code. HANSON worked straight through the Christmas shutdown and in early January, he came down with another stress illness. Once again, his face was

1   blackened and cover with stress related rash. He was unable to go out in the public. So he worked from

2   home again. Suddenly, he got a call to the effect that the 'sky was falling' and management was concerned

3   about the software timeliness. Although the hardware requirement for the software was changing on a daily

4   basis, HANSON was sure that he would complete the code on time, despite falling sick. He had written the

5   software code in a way that would accommodate the ever changing hardware requirement, without a major

6   modification in the code.

7       38.  So, to minimize the team's concern, HANSON packed up and went to the office despite his illness.

8   Others were all shocked to see him in that condition. Embarrassed in the way he looked, HANSON

9   continued on as if he was fine. He went on and worked on the code in the electronic lab. RAYTHEON'S

10  concern was to have him there, in the lab, so they could be sure he was working on the code.

11      39.  Wilson sent HANSON a message with the following comment: "You purport yourself to be a

12  software developer, here is an opportunity for you to prove yourself". He directed people to monitor

13  HANSON'S progress and report to him. One individual personally approached HANSON, requesting daily

14  status, per Wilson's directive. Apparently she was aware that HANSON was on PIP, which would violate

15  the company privacy policy.

16      40.  By March 2011, Mr. Wilson organized the transfer of Cef Vinas into his new department outside of

17  the Electronics Center. Accordingly, the second Performance Improvement Plan was left incomplete.

18  HANSON was left in limbo. He did not receive a 2010 annual performance review and did not get the final

19  signed PIP review that he had completed. Although he did not know it, he remained on PIP status. This

20  was outside RAYTHEON'S policy. He did not get a salary increase or bonus for 2010 year, which everyone

21  at RAYTHEON received. He did however, complete the software code on time, and it worked with flying

22  colors without a glitch.

23      41.  HANSON went on to work on a few more proposals and Electronic Center's (EC) processes and

24  tools. He defined and trained Section Mangers and Department Managers on several RAYTHEON

25  processes and tools. These processes and tools, although in need of major redesign and redefinition, had

26  been around at RAYTHEON long before HANSON got there.  None of the Section Managers, and a

27  majority of the Department Managers, knew how to use them, or understood their usefulness. HANSON

28

1   quickly came up to speed, redesigned and defined the processes and tools, and trained these managers as

2   well some of their staff members.

3       42.  On or about April 2011, HANSON was moved into yet another department within the Electronics

4   Center. This time it was headed by Mr. Rahul Dixit. This is when HANSON met Mr. James Henry for the

5   first time. James Henry is one the Production Section Managers at Raytheon. Mr. Robert Cowan, was

6   appointed as HANSON'S Section Manager. Mr. Cowan asked HANSON if he knew where his personnel file

7   was, because he had been trying to get the file to do HANSON'S 2011 mid-year review, but was getting

8   'push-backs' and run-around by HR. HANSON said he had never seen his personnel file even though he

9   had asked to see it and had received no response from HR. Mr. Cowan said he was going to keep on

10  asking questions until he got the file. Cowan and HANSON had both reported to Wilson in the year 2010.

11  Cowan was already aware of the way RAYTHEON was treating HANSON. A few days later, he told

12  HANSON that he had located the file in Texas. Cowan said he was not allowed access to HANSON'S file.

13  He said "Raytheon owes you an apology in the way they have treated you".  He was going to try to get the

14  file from Texas and "right the wrong" done to HANSON. A couple of weeks later Robert (Bob) Cowan was

15  forced to retire.

16      43.  On July 11, 2011, James Henry called HANSON into a meeting with Mr. Dixit. Mr. Dixit asked if

17  HANSON had completed and signed off on the 2010 PIP review. HANSON told him that he did complete

18  the PIP. He explained that Ryen Wilson and Cef Vinas were supposed to get it signed off in HANSON'S

19  presence to remove the PIP status, but that he had not heard anything about it since then. Henry asked

20  HANSON if he was aware that he had been placed on yet another PIP for the year 2011 (the third in 2

21  years). HANSON said "No, I was not aware….." Henry said "I don't think you knew about it". HANSON told

22  him if he had been placed on PIP again for the third time, it would violate RAYTHEON'S performance

23  review policy. He said "well, so that you know, you had been placed on PIP for 2011". He said he

24  recognized that "a lot wrong had been done to" HANSON. He said, "I don't want you to look at what

25  happened in the past", and "to move forward". He said he wanted HANSON to undergo the Performance

26  Improvement Plan (PIP) again", this time for the year 2011.

27      44.  HANSON was very disturbed, saddened and upset by this surprised revelation. He was left dumb-

28  founded, and near tears. HANSON told Henry he had been treated unfairly, and was being once again

targeted unfairly. Henry said, "I understand...., but I want you to know that you have allies". He said " I know how painful it is…"

45.  The pain for HANSON due to emotional distress was unbearable. Within hours, going into the night, his stress level shot-up. He had lost weight. He had been having breathing problems at work, but not anywhere else. On the day of the announcement of the 2011 PIP, Mr. Cowan was gone on vacation. Plaintiff believes management waited until Cowan had gone on vacation before telling HANSON about the third PIP. Plaintiff alleges that this was because Cowan had vowed to "right the wrong" done to HANSON. Cowan was pushed aside and made irrelevant for seeking to help HANSON..

46.  Henry volunteered to "fix things", because, quoting him, "You have been thrown under the bus". Mr. Henry said thus on multiple occasions during the next 8 months. HANSON was assigned yet another PIP set of tasks to complete. This time, it included taking four on-line classes. Henry was to monitor his progress on a weekly basis for the PIP's 3-months period, which would end on September 15, 2011. Reluctantly and fearing losing his job, HANSON did his best to comply.  However he repeatedly complained that he had been wronged for two and a half years and that his treatment was not fair.

47.  Even though, HANSON'S PIP tasks had been assigned by Dixit with Henry present, Henry later began changing the goals and added several more tasks over the three months. This constantly changing demand made it difficult for HANSON to succeed on the PIP. It was clear that Henry was communicating with Wilson, who had been transferred to different Center.

48.  On or about July 28th, 2011, HANSON observed Henry as he went into HANSON'S Performance and Development System (PDS) file in the computer system and deleted Mr. Wilson's 2010 review which, as stated above, began with "Herb has shown improvement….",  He replaced it with a more negative review. HANSON knew what Mr. Henry had just done was illegal, and would not only violate company policy but also was in violation of the law. HANSON questioned him as to why he had deleted the personnel record. He responded and said "I'm just gonna replace it with this one"; referring to a more negative and derogatory review he had written days prior. HANSON told him he should not have done that. HANSON asked him to send HANSON a copy of what he was adding on the record. He said he wouldn't send it and that HANSON should get it from HR Manager Denise Gauthier, who was based in Texas.

49. It was during this time frame that HANSON learned that Mr. Cefarino (Cef) Vinas had also written 2010 performance review of him, but he had not been made aware of it or seen it.

50. HANSON does not know why his personnel file was transferred to Texas for HR administration. His regular HR Manager, Laurie Vilmur, was located in El Segundo, California, and actively performing HR duties for the Engineering Center. She also had at least two or more assistants performing HR duties for the Engineering Center. This is alleged to be an effort to hide retaliation and racial and ethnic origin discrimination and harassment. HANSON was later informed by a reliable source "Herbert, don't you know there are people pushing James [Henry] do this these things to you, What are you still doing here? Why don't go on disability so you can get better, and be there for your son? Don't you know this will never get better….? I know… they did the same thing to my friend".

51. Henry did everything possible to keep HANSON'S supervisor Cowan from participating in the 2011 PIP review. Henry also went out of his way to make sure HANSON would not succeed on the PIP review. Henry's actions were reflected in negative comments in the review in spite of HANSON'S hard work and success. In every weekly meeting, he told HANSON that he didn't think he would succeed in the PIP, but "that will be Noel Ellis's decision". He boasted about someone he had help fired. He told HANSON "Mike McClay wants you banned from all proposals". To HANSON'S knowledge Mr. McClay didn't have a problem with HANSON'S proposal work. He had signed off on the proposals with no problem.

52. Henry went out of his way to seek negative comments concerning HANSON and sent out requests to 20 Raytheon employees for feedback as part of HANSON'S 2011 mid-year review. This was unprecedented and far-reaching and discriminatory towards HANSON. The normal and standard peer review request is 2 to 6 employees. HANSON had already furnished Henry with 3 suggested peer reviewers. However, these were evidently ignored.  HANSON alleges that there no any instance of 20 peer review feedbacks for a single review of any employee at RAYTHEON in the company's history.

53. It was now clear to Plaintiff that the Henry was being pushed and directed by individuals who didn't want HANSON at Raytheon. In one instance, Henry failed to open the email HANSON sent to him a day prior, but choose to send a negative email to HR Manager, Denise Gauthier in Texas about how HANSON lacked process competence, and "failed to follow the process". There was no such process as Henry e was referring to, written or verbal ,anywhere at Raytheon, and certainly not within the confines of the

1   department. In addition, HANSON had already completed the work and accomplished the very same task

2   he complained to HR about.

3       54.  Henry sent yet another email in all capital letters on the subject of work completion to HANSON.

4   When HANSON called him and told him he was doing the same thing Wilson used to do; he said "You are

5   the person in common", Henry said HANSON should call Denise Gauthier and she would tell him what's

6   next. HANSON called Ms. Gauthier and left a message in her voicemail, telling her he could fall back into

7   severe stress condition as a result of James Henry's improper behavior.

8       55.  On September 8th, 2011, Henry and HANSON had the second to the last PIP review meeting.

9   There were no concerns expressed. There were no notable action items from either Henry or Denise

10  Gauthier. HANSON was told that the last meeting on the PIP to show completion of the PIP work would be

11  09/15/2011 with Noel Ellis. However, that final meeting to conclude the PIP review, and remove him from

12  PIP status never took place. HANSON did not get a 2011 annual performance review, and did not get the

13  final signed PIP review that he had completed.

14      56.  In October 2011, Mr. Cowan retired. Medica Denton was assigned to be HANSON'S Acting Section

15  Manager. He met with Ms. Denton a couple of times. In late November 2011, Roosevelt Womble was

16  assigned to take over as HANSON'S Acting Section Manager. Sometime in August of 2011, he was

17  working a project with Mr. Womble. During that period, Womble repeatedly told HANSON that he knew that

18  he was on PIP status. HANSON asked him how he knew. He said he had been told that there was a

19  "perception" about HANSON in the company. He said that he was also told that HANSON "took Ryen

20  Wilson to HR". HANSON responded that all he did was tell his side of the story. Womble went on to tell

21  HANSON how well he knew Ryen Wilson and his behavior, and they "go way back".

22      57.  HANSON was instructed to continue charging the F18 charge number after his work on that

23  contract was completed. He complained that the work he was doing on the project was not sufficient and

24  did not justify to continuing to charge full time hours to the program. HANSON had gone to management to

25  ask for more tasks and charge numbers to make up his full time work, but this was denied. HANSON was

26  told by Henry to continue to charge to the charge number at full time, in spite of fact that he was only

27  working half-time on the program. He was told to continue attributing all his time to this charge number

28  "until they tell you, you can't do that full time". Overcharging to this contract number would result in a false

1    and overstated bill to the Federal government.  As a consequence, HANSON was forced to use his

2    personal accrued vacation time on numerous occasions in order to avoid charging full time to the project

3    charge number.

4        58. On January 2Oth, 2012, HANSON received a call from Stephen Nordel. He asked about a charge

5    number HANSON had been charging to on the work he was doing. HANSON told him that the charge

6    number was given to him by Albert Meng for the work on F18 /F15 CISP failures. He acknowledged that he

7    was aware of the work HANSON was doing for the program, and stated that it was critical and  important

8    that he continue and complete that work because a technical solution was absolutely necessary which

9    would resolve the failure on the hardware which had been a problem for 15 years. He instructed HANSON

10   that he needed to transfer the charges to a different charge number even though the work was initially

11   billed to the correct number.  Nordel stated that it was "not a big deal".

12       59. HANSON'S employment at RAYTHEON was terminated on or about January 25, 2012. On

13   01/25/2012, he received a call from James Henry to come to Noel Ellis' office. Before going into Mr. Ellis'

14   office, HANSON met with Mr. Henry outside and asked him what was going on. He said, "Noel Ellis will tell

15   you". HANSON was asked to come into the conference room in the executive office. In the room were

16   Rahul Dixit, Laurie Vilmur and another female representing Security Details. HANSON was told by Rahul

17   Dixit "Herb, It's termination day!". HANSON asked what the reason for the termination was. He was simply

18   told "performance". He asked for a specific performance standard which he had not performed. Laurie

19   Vilmur said, "We just want to process you out of the company today, if you have any questions, you can

20   send them to me in writing and I would have them answered for you".  Moments later, Mr. Henry was called

21   into the meeting, to walk HANSON to his office and watch him pack his personal belongings, and then walk

22   him out.

23       60. Raytheon employees frequently and involuntarily use their personal vacation hours to take days off

24   for fear of not being noticed by management when they are not assigned to task. In other occasions, the

25   employees continue to charge their hours to a charge number without doing any work on the project in

26   question. Much of this is the result of Raytheon management banning employees from charging to the

27   overhead charge number when employees are not assigned to tasks with appropriate charge numbers.

28   The overhead charge number funds know as "Waiting Assignment" (and intended for employees' in-

1   between assignments charge number) are apportioned and assigned in every fiscal year budget. It is a US

2   Government requirement for all Defense Contractor and subcontractors to prevent employees from

3   charging non-government contract work to government contract work. Every year, RAYTHEON becomes

4   more creative with these "waiting assignment" funds and prevent employees on waiting assignments from

5   charging to it. The funds are then distributed to senior management as bonuses.

6       61.  HANSON filed administrative complaints with the Equal Employment Opportunity Commission

7   (EEOC) and the California Department of Fair Employment and Housing (DFEH) more than 180 days

8   before the filing of this Complaint. He has received a notice of right to sue from the DFEH.

9                              **FIRST CAUSE OF ACTION**
                **Discrimination Based on Race and National Origin, Title VII**
10

11      62.  HANSON incorporates and restates the allegations of paragraphs 1 through 61 above as if set

12   forth fully here.

13      63.       As described herein RAYTHEON engaged in a pattern of harassment and subjected

14   HANSON to a hostile work environment as a result of his race and national origin. RAYTHEON also

15   discriminated and retaliated against HANSON as a result of his race and national origin and as a result of

16   his complaints about his treatment. HANSON'S race national origin and his complaints were a motivating

17   factor in the alleged wrongful acts by RAYTHEON.

18      64.       As alleged herein RAYTHEON engaged in the alleged discriminatory and retaliatory practices

19   with malice or with reckless indifference to HANSON'S federally protected rights. Accordingly, HANSON is

20   entitled to an award of punitive damages.

21      65.       As a result of RAYTHEON'S conduct and violations of law, HANSON has suffered lost

22   compensation and employment benefits and has suffered other damage including, without limitation, loss of

23   reputation and status, humiliation, loss of career opportunity, emotional distress, and  stress. HANSON has

24   also incurred attorney fees and costs of litigation.

25                              **SECOND CAUSE OF ACTION**
                    **Discrimination Based on Race 42 USC §1981**
26

27      66.       HANSON incorporates and restates the allegations of paragraphs 1 through 65 above as if set

28   forth fully here.

67.   As described herein, RAYTHEON intentionally discriminated against HANSON in violation of 42 USC §1981. A determinative factor in the decision to terminate HANSON'S employment was his race and national origin.

68.  RAYTHEON engaged in intentional discrimination concerning HANSON and did so with malice or reckless indifference to his federally protected rights. Accordingly, HANSON is entitled to an award of punitive damages.

69.   As a result of RAYTHEON'S conduct and violations of law HANSON has suffered lost compensation and employment benefits and has suffered other damage including, without limitation, loss of reputation and status, humiliation, loss of career opportunity, emotional distress, and  stress. HANSON has also incurred attorney fees and costs of litigation.

## THIRD CAUSE OF ACTION
### Discrimination Based on National Origin and Race, California FEHA

70.   HANSON incorporates and restates the allegations of paragraphs 1 through 69 above as if set forth fully here.

71.   As described herein RAYTHEON engaged in a pattern of harassment and subjected HANSON to a hostile work environment as a result of his race and national origin. RAYTHEON also discriminated and retaliated against HANSON as a result of his race and national origin and as a result of his complaints about his treatment. HANSON'S race national origin and his complaints were a motivating factor in the alleged wrongful acts by RAYTHEON.

72.  As a result of RAYTHEON'S conduct and violations of law HANSON has suffered lost compensation and employment benefits and has suffered other damage including, without limitation, loss of reputation and status, humiliation, loss of career opportunity, emotional distress, and  stress. HANSON has also incurred attorney fees and costs of litigation.

73.  Pursuant to California Code of Civil Procedure § 3294, HANSON is entitled to an award of punitive damages for the actions of RAYTHEON alleged herein.  RAYTHEON acted with malice, oppression, or fraud.  Its conduct was intentionally harmful and/or showed a reckless disregard for the rights and safety of HANSON.

**FOURTH CAUSE OF ACTION**
**Federal Whistleblower claim, False Claims Act 31 U.S.C. §3730**

74.    HANSON incorporates and restates the allegations of paragraphs 1 through 73 above as if set forth fully here.

75.    As described herein, HANSON engaged in conduct protected by the Federal False Claims Act. This included but was not limited to the use of an overhead number when appropriate, the refusal to submit bogus made up numbers as part of a government bid proposal, and protests concerning charging work to inappropriate contract billing numbers. RAYTHEON was aware of his protected conduct. RAYTHEON discriminated and retaliated against him as a result through the conduct described herein.

76.    As a result of RAYTHEON'S conduct and violations of law HANSON has suffered lost compensation and employment benefits and has suffered other damage including, without limitation, loss of reputation and status, humiliation, loss of career opportunity, emotional distress, and  stress. HANSON has also incurred attorney fees and costs of litigation.

.

**FIFTH CAUSE OF ACTION**
**California Labor Code §1102.5**

77.     HANSON incorporates and restates the allegations of paragraphs 1 through 76 above as if set forth fully here.

78.    As set out herein, RAYTHEON harassed, discriminated against and retaliated against HANSON because of his refusal to participate in the unlawful billing activities of RAYTHEON. This conduct was in violation of California labor Code Section 1102.5.

79.    As a result of RAYTHEON'S conduct and violations of law HANSON has suffered lost compensation and employment benefits and has suffered other damage including, without limitation, loss of reputation and status, humiliation, loss of career opportunity, emotional distress, and  stress. HANSON has also incurred attorney fees and costs of litigation.

**SIXTH CAUSE OF ACTION**
**Retaliation in Violation of California Labor Code §98.6**

80.    HANSON incorporates and restates the allegations of paragraphs 1 through 79 above as if set forth fully here.

81.   As set out herein RAYTHEON retaliated against HANSON for his refusal to engage in unlawful billing practices and his protests concerning the practices and concerning the forced taking of accrued vacation. The actions of RAYTHEON violated California Labor Code §98.6 and HANSON was damaged as a result.

82.  As a result of RAYTHEON'S conduct and violations of law HANSON has suffered lost compensation and employment benefits and has suffered other damage including, without limitation, loss of reputation and status, humiliation, loss of career opportunity, emotional distress, and  stress. HANSON has also incurred attorney fees and costs of litigation.

### SEVENTH CAUSE OF ACTION
### Wrongful Discharge in Violation of Public Policy

83.   HANSON incorporates and restates the allegations of paragraphs 1 through 82 above as if set forth fully here.

84.  The Federal False Claims Act establishes a public policy against the improper billing on government contracts. Vacation accrued is earned wages and cannot be lawfully taken by the employer. The conduct of Raytheon described herein was an unlawful taking of earned wages from HANSON and others pursuant to California law. Upon termination of employment all earned and unused vacation must be paid to the employee at his or her final rate of pay (Labor Code Section 227.3) and RAYTHEON'S conduct violated this requirement.

85.   As set out herein, HANSON made complaints, protested, and objected to improper conduct by RAYTHEON. As further set out herein RAYTHEON discriminated and retaliated against HANSON in violation of federal and California state law.  Raytheon discriminated and retaliated against HANSON based on his protected activity and on his race and national origin by various actions including, without limitation, the following: his treatment in the workplace and the harassment directed at him; the requirement that he and others use vacation time to perform work; the practice of RAYTHEON of billing development work to existing government contracts.

86.   RAYTHEON retaliated against HANSON by the conduct described herein including but not limited to termination of his employment, poor performance reviews, placing him on the PIP, denial of raises and bonuses, and denial of requested positions he applied for.

87.   Pursuant to California Code of Civil Procedure § 3294, HANSON is entitled to an award of punitive damages for the actions of RAYTHEON alleged herein.  RAYTHEON acted with malice, oppression, or fraud.  Its conduct was intentionally harmful and/or showed a reckless disregard for the rights and safety of HANSON.

88.   As a result of RAYTHEON'S conduct and violations of law HANSON has suffered lost compensation and employment benefits and has suffered other damage including, without limitation, loss of reputation and status, humiliation, loss of career opportunity, emotional distress, and  stress. HANSON has also incurred attorney fees and costs of litigation.

**PRAYER FOR RELIEF**

Based on the forgoing and the evidence to be presented at trial Plaintiff prays the following:

1.    Reinstatement to the same or similar position;

2.    Lost wages, benefits and other compensation in the amount of not less than $200,000 to date and ongoing;

3.     Salary increases and bonuses for 2009 and 2010;

4.     Doubling of lost wages;

5.    Compensatory and punitive damages in the amount of $300,000;

6.     An award of interest;

7.     Special damages in an amount to be proven at trial

8.    Punitive damages in the amount of $1,000,000;

9.    Reinstatement to his former position;

10.   An award of attorney fees and costs in an amount to be proven at trial;

11.   Such equitable or injunctive relief as the Court deems proper;

12.   Such other and further relief as the Court deems just and proper.

1

2

3

4

5     Dated this 10th day of June, 2013

6

7

8

9

10                                                  Karen E. Ford Esq.
                                                    Attorney for Plaintiff
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28